UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

STONE ENERGY CORP ET AL           CIVIL ACTION NO.  6:18-CV-00213

VERSUS                            JUDGE JUNEAU

NIPPON STEEL & SUMITOMO           MAGISTRATE JUDGE WHITEHURST
METAL CORP

## MEMORANDUM RULING & JUDGMENT

Before the Court is a Motion for Partial Summary Judgment, Rec. Doc. [169], filed by Defendants, Pyramid Tubular Products LLC ("Pyramid") and Sumitomo Corporation of Americas (together the "SCOA Defendants" and referred to interchangeably as Pyramid or SCOA Defendants throughout). The Motion is opposed by Plaintiff, Stone Energy Corp ("Stone"). This Motion came for oral argument before the Court on July 16, 2020. At hearing, the Court took this matter under advisement. After review of the parties' submitted briefs, review of the relevant law, and consideration of oral argument, the Court **DENIES** the motion for the following reasons.

## Background

Stone purchased pipe from Nippon Steel ("Nippon") for construction of the Amethyst 1 well in the Gulf of Mexico. Stone's lawsuit alleges that the pipe was defective and caused a total loss of Stone's well. Pyramid was the seller and liaison

between Stone, an American company, and Nippon, a Japanese company. Stone claims that Pyramid is liable under the Louisiana Products Liability Act ("LPLA") and for warranties under the sales articles of the Louisiana Civil Code. Pyramid seeks partial summary judgment on Stone's claims brought against Pyramid under the LPLA and also under the Civil Code warranties.

### A. *Defendants' Argument*

Regarding the LPLA, Pyramid argues that it does not meet the statutory definition of manufacturer. First, Defendants argue that Pyramid did not exercise control or influence over the construction, design, or quality of the pipe at issue in this case. Alternatively, Defendants contend that Pyramid is not the alter ego of Nippon under the LPLA's alter ego provision.

With respect to the Civil Code warranties, the SCOA Defendants argue that *Chesapeake Louisiana, L.P. v. Innovative Wellsite Sys., Inc.*, No. 12-cv-2963, 2014 WL 5796794, at *4 (W.D. La. Nov. 6, 2014); *Southwest. La. Hosp. Ass'n v. BASF Const. Co*, 947 F. Supp. 2d 661, 699 (W.D. La. 2013), *amended* (Sept. 6, 2013); and *Hollybrook Cotton Seed Processing, LLC v. Carver, Inc.*, No. 09-cv-0750, 2010 WL 892869, at *8 (W.D. La. Mar. 11, 2010) apply in the present matter. The SCOA Defendants contend that this Court should follow this line of cases which they argue holds that redhibition subsumes the other warranties in the sales articles of the Civil

Code and therefore limit Stone's warranty action against the Defendants to redhibition.

## B. *Stone's Argument*

Stone claims that the Defendants are liable under the LPLA because Pyramid exercised control over the design or quality of the pipe and alternatively, that Pyramid was the alter ego of Nippon for purposes of the LPLA. Regarding the exercise of control, Stone contends that Pyramid influenced the design of the pipe because Pyramid took the required specifications for the pipe from Stone and relayed that information to Nippon Steel. Stone argues that Pyramid contracted to install the couplings onto the pipe (a process called "bucking on") and to inspect the tubing.

Alternatively, Stone argues that Pyramid is Nippon's alter ego because (1) Pyramid considered itself a "trusted partner" of Nippon—i.e., Pyramid helped Nippon sell its products in the United States;[1] (2) Pyramid included in its terms and conditions that it would continue to be the "conduit" between Stone and Nippon as long as the pipe was in use (this included an arrangement where any warranty that Pyramid received from Nippon would be transferred to Stone); (3) Pyramid installed the couplings onto the pipe ("bucking on"); (4) Pyramid inspected the pipe; and (5) Pyramid relayed information between Nippon and Stone regarding the specifications of the pipe.

---

[1] Rec. Doc. [188], p. 7.

Stone also contends that Pyramid is liable under the Civil Code sales warranty articles. Stone argues that the holdings of the cases cited by the SCOA Defendants are narrow in scope and only hold that redhibition subsumes other warranties when the existence of a defect is undisputed. Stone claims that because the parties are still contesting defects, the SCOA Defendants' motion should be denied.

## Law and Analysis

The issues before the Court include: (1) whether Pyramid is a "manufacturer" for purposes of the LPLA by exercising control or influence or as alter ego of Nippon;[2] (2) whether the availability of redhibition precludes pursuance of the warranty of fitness; and (3) whether redhibition precludes pursuance of the warranty of kind or quality. The warranty issue includes a complex and unsettled question of Louisiana law.

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio.*, 475 U.S. 574, 586–87 (1986). A genuine issue of fact exists only "if the evidence is such that a

---

[2] La. R.S. § 9:2800.53(1).

reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *See id*. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id*. at 249-50 (citations omitted).

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of her case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. *See Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. *Id*. *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.

B. *Erie Doctrine*

Under the Erie doctrine, this Court must apply state substantive law when it sits in diversity. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The motion before the Court pertains to the LPLA and Louisiana Civil Code and thus requires this Court to apply Louisiana substantive law.

No Louisiana Supreme Court decision has answered the questions surrounding the interaction between redhibition and the other sales warranties. In the absence of authority from the Louisiana Supreme Court, this Court must make an Erie guess as to how the Louisiana Supreme Court would rule. *SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 436 (5th Cir. 2008). In so doing, the Court's "task is to attempt to predict state law, not to create or modify it." *Id*. at 442 (quoting *Hermann Holdings, Ltd. v. Lucent Techs., Inc*., 302 F.3d 552, 558 (5th Cir. 2002)). "In making an Erie guess . . . [courts] may look to the decisions of intermediate appellate state courts for guidance." *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000). Nevertheless,

> In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante,* is a secondary law source in Louisiana." Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (internal citations omitted).

### C. The Louisiana Products Liability Act Claim

The Louisiana Products Liability Act is the exclusive remedy in Louisiana for tort claims arising from defective products. La. R.S. § 9:2800.52. The LPLA provides in pertinent part:

"Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:

(b) A <u>seller</u> of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.

(d) A <u>seller</u> of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer. The court shall take into consideration the following in determining whether the seller is the alien manufacturer's alter ego: whether the seller is affiliated with the alien manufacturer by way of common ownership or control; whether the seller assumes or administers product warranty obligations of the alien manufacturer; whether the seller prepares or modifies the product for distribution; or any other relevant evidence. A "product of an alien manufacturer" is a product that is manufactured outside the United States by a manufacturer who is a citizen of another country or who is organized under the laws of another country.

La. R.S. § 9:2800.53(1) (emphasis added). In this case, only the "seller-manufacturer" scenarios under the statute are relevant: (1) a scenario in which Pyramid exercised control or influence over the defective pipe or (2) a scenario in which Pyramid is an alter ego of Nippon.

### 1. Did Pyramid Exercise Control or Influence over the Pipe?

La. R.S. § 9:2800.53(1)(b) states that the definition of "manufacturer" applies to "[a] seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage." Stone first contends that Pyramid's communication of specifications between Nippon and

Stone constitutes an exercise of control or influence over the product. However, the Court finds that this is not the type of control or influence that the LPLA envisions.

In this case, Pyramid relayed information about the specifications of the pipe from Stone to Nippon without any control over those specifications. The Court finds *Parks ex rel. Parks v. Baby Fair Imports, Inc.*, 726 So. 2d 62 (La. App. 5th Cir. 1998) instructive. In *Parks*, the court determined that K-Mart was not a "manufacturer" under the LPLA when the retailer merely communicated with the manufacturer and selected 55 cotton/45 polyester shirts from the manufacturer's catalog. *Parks* reasoned that such a broad definition would essentially encompass any retail seller. Although, in the present case, Pyramid's role is slightly less passive than that of K-Mart's in *Parks*, Pyramid's mere relay of information from Stone to Nippon does not render Pyramid a manufacturer under the LPLA. Holding otherwise would be an overly broad interpretation of the statute. Furthermore, the Court finds that Stone is the primary party that influenced the design by providing specific specifications about the well's environment.

Additionally, Stone argues that Pyramid had the pipe inspected and placed the pipe through a process known as "bucking on." Stone contends that these actions constituted an exercise of control or influence over a characteristic of the design, construction, or quality. Based on the Court's examination of the record and the parties' argument, the "bucking on" process appears to be fairly consequential and

involved. The process involves outfitting the couplings on industrial pipes for offshore use, and errors at these connections could result in major failures.

Given that the "bucking on" process likely constitutes influence over design, construction, or quality, the issue then becomes whether this process caused the damage. In *Frierson v. Spanset, Inc.*, 2010 WL 11537999, at *4 (E.D. La. Aug. 18, 2010), the court construed the phrase "that causes damage" to modify the word, "characteristic" in La. R.S. § 9:2800.53(1)(b). *Id.* As a result, a seller's exercise or control of a characteristic that causes damage within a product results in liability under the LPLA rather than simply a seller's exercise or control of any characteristic. The Court finds that this interpretation accords with the policy of the LPLA which seeks to hold liable those who contribute to product defects.[3]

Pyramid argues that the cause of the defect is hydrogen embrittlement—an effect caused solely by Nippon's manufacturing process. Stone contends that the pipe's failure occurred at a coupling joint—implicating the "bucking on" process. Under the general definition of manufacturer in the LPLA, issues of material fact can preclude summary judgment. *Cook v. United Container Mach.*, 712 So. 2d 307, 309 (La. App. 5th Cir. 1998) (finding a genuine issue as to whether an agent of a company assisted in designing a printer for purposes of "producing, making,

---

[3] This rationale is weaker for La. R.S. § 9:2800.53(1)(d) concerning a seller who is an alter ego. The statute sets out a very particular definition of an alter ego seller and seeks to hold domestic sellers accountable for defects caused by foreign manufacturers when the domestic seller is highly involved with both the product and the foreign manufacturer.

fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product" under primary definition of manufacturer in LPLA).

Construing the limited evidence on causation and Plaintiff's complaint in the light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact regarding whether "bucking on" caused the defect. Although the Court finds that "bucking on" constitutes control or influence of a characteristic of the design, construction, or quality, the Court cannot say whether "bucking on" resulted in a characteristic that caused the damage. Accordingly, the Court finds there is insufficient evidence to grant summary judgment on this ground.

However, the present case also deals with a different provision and definition of manufacturer under the LPLA than the typical case. La. R.S. § 9:2800.53(1)(d) states, "***The court*** shall take into consideration the following [factors to determine alter ego]." The statute appears to direct the Court to take on the fact intensive inquiry of whether sellers are "alter-ego manufacturers." Because the parties also raise the issue of alter ego, the Court will address this definition of manufacturer even though issues of fact preclude summary judgment on the "control and influence" definition.

### 2. Is Pyramid the Alter Ego of Nippon?

Although the Court finds issues of fact regarding "control and influence," the Court finds that Pyramid is the alter ego of Nippon. The LPLA states that the

definition of manufacturer extends to a seller of a product from an alien corporation who is an alter ego of that alien corporation. La. R.S. § 9:2800.53(1)(d). The statute compels the court to consider four factors for determining alter ego: (1) whether the seller is affiliated with the alien manufacturer by way of common ownership or control; (2) whether the seller assumes or administers product warranty obligations of the alien manufacturer; (3) whether the seller prepares or modifies the product for distribution; or (4) any other relevant evidence.

First, Stone argues that Pyramid is controlled by Nippon because Nippon and Pyramid consider themselves to be "trusted partners," and Pyramid's terms and conditions state that it will be the liaison between Stone and Nippon throughout the course of business. However, there is insufficient evidence in the record to show that Nippon had control or ownership over Pyramid. The terms and conditions merely provide for warranty obligations. They do not outline any relationship of control or common ownership.[4] Therefore, the first factor is not met.

Second, Stone argues that Pyramid agreed to assume or administer warranty obligations from Nippon. In Pyramid's terms of service, Rec. Doc. [188-10], Pyramid agrees to pass on the benefits from any warranties that exist and are extended by the manufacturer. The specific term at issue provides:

> New API tubulars are only guaranteed in accordance with the manufacturer's published warranties and end finishing and testing work

---

[4] Rec. Doc. [188-10].

are guaranteed only in accordance with the warranties provided by the end finisher and/or tester. As such, all benefits of such _warranties shall be passed on by Seller to its customers and Seller shall not in any way or at any time be liable for any such warranties._[5]

The jurisprudence is scant regarding what it means to "administer" a warranty, but it seems as if an agreement by which Pyramid would pass on to Stone any warranty benefits it receives from Nippon constitutes "administering" a warranty as provided in the statute.

Pyramid contends that the last clause in the warranty, "seller shall not . . . be liable for any such warranties," means that Pyramid does not assume or administer the warranty. However, this last clause speaks to Pyramid's liability for warranties, not administrability. This clause simply reiterates that Pyramid owes no warranties, itself; rather, the warranties come from the manufacturer. Even though warranties come from the manufacturer, Pyramid still "administers" the warranty as Nippon's warranty is passed on to Stone by Pyramid. Therefore, this second factor is probably met.

Pyramid also offers the declaration of Glenn McDonald, an account manager of Pyramid, in support that Pyramid did not administer the warranty. However, this evidence is questionable. The declaration merely states in pertinent part, "Pyramid did not modify the Products, exercise control of the design of the Products, or assume

---

[5] Rec. Doc. [188-10] (emphasis added).

or administer any product warranty obligations of the manufacturer, Nippon Steel." The declaration reads as a legal conclusion from the statute and does not reference the warranty terms.

Third, Stone notes that Pyramid inspected and "bucked on" the pipe before it was sent to Stone and contends that this meets the third factor, "whether the seller prepares or modifies the product for distribution." Pyramid mainly relies on its argument for "control and influence" and argues that the rationale from *Parks ex rel. Parks v. Baby Fair Imports, Inc.*, 726 So. 2d 62 (La. App. 5th Cir. 1998) (the K-Mart Case) should also apply to whether Pyramid prepares or modifies the product for distribution. Pyramid also relies on other cases that speak to other provisions of the definition of manufacturer in the LPLA rather than the third factor for alien manufacturer. Pyramid additionally relies on the same declaration from Glenn McDonald previously discussed.

Jurisprudence on this factor, like the others, is scant, and the opinions that do exist are mostly conclusory with little explanation. It appears, based on the language of the statute, that this third factor for preparing and modifying is broader than the seller-manufacturer who exerts control and influence over the product. First, different language is used in La. R.S § 9:2800.53(1)(b) (control and influence) than in La. R.S. § 9:2800.53(1)(d) (alter ego), which suggests different meaning. Second, "preparing and modifying" are activities that are less hands-on than "influencing and

controlling" the product. The latter suggests that the seller has a hand in determining the actual construction of the product. The former suggests that the seller performs some final step in readying the finished product. Once again, the question of whether "bucking on" is "preparing or modifying" is one of degree. In other words, how important to the function of the product is "bucking on" the couplings?

The evidence in the record shows that Pyramid contracted out the work of "bucking on," and it contracted out the inspection work at the request of Stone. Because it contracted out the work, Pyramid argues that it cannot have prepared or modified the product. The Court is unpersuaded by this argument since Nippon, the true manufacturer, contracted out most of the work in constructing the pipe and is still considered the manufacturer. The record contains numerous pages of documents with work orders for "bucking on" and inspection data. Ignoring the inspection, which was done at the request of Plaintiff, "bucking on" alone still has a significant paper trail in the record. For this reason and the reasons stated previously regarding control and influence, the "bucking on" procedure was more involved and more important to the function of the product than merely assembling a few minor pieces before delivering the product to the buyer. Thus, the third factor for "preparing and modifying" is met.

For these reasons, two of the three LPLA alter ego factors[6] favor treating Pyramid as a seller-manufacturer. Accordingly, summary judgment is denied regarding the LPLA, and Plaintiff may proceed on this theory.

### D. The Louisiana Civil Code Warranties

The Civil Code warranties at issue are: (1) redhibition; (2) the warranty of fitness; and (3) the warranty of quality and kind. Regarding redhibition, "The seller warrants the buyer against redhibitory defects, or vices, in the thing sold." La. Civ. Code art. 2520. "A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." *Id*. A defect can also be redhibitory when "without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price." *Id*. Thus, redhibition requires (1) a defect (2) that exists at the time of sale (3) that renders the thing useless or so inconvenient that the buyer would have either not bought it or paid much less for the thing, and (4) a defect of which the buyer was unaware (hidden). Depending on the severity of the defect as outlined above, the remedy is either rescission of the sale or a reduction in price (*quanti minoris*).[7] *Id*.

---

[6] The Court acknowledges that there is a "catch all" fourth factor of "any other relevant evidence."

[7] If a seller is in bad faith, redhibition provides the remedy of rescission, damages, and attorney fees. La. Civ. Code art. 2545. In this case the parties do not argue and the pleadings do not suggest that Pyramid was in bad faith.

The warranty of fitness provides, "The thing sold must be reasonably fit for its ordinary use." La. Civ. Code art. 2524. Additionally, "When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose." *Id*. The former is known as fitness for ordinary use and the latter is known as fitness for particular use.[8] The remedy for a breach of this warranty is governed by the general rules of conventional obligations entitling the buyer to rescission of the sale and damages. La. Civ. Code art. 2524; art. 1994 *et seq*. In this case, only fitness for ordinary use is at issue.

Finally, the Civil Code also provides, "[W]hen the thing the seller has delivered, though in itself free from redhibitory defects, is not of the kind or quality specified in the contract or represented by the seller, the rights of the buyer are governed by other rules of sale and conventional obligations." La. Civ. Code art. 2529. This warranty has received very little judicial attention throughout its history.

The most contentious issue before the Court is the interaction between redhibition and the warranty of fitness (and to a lesser extent the warranty of kind and quality). This is an unsettled issue of Louisiana law which requires this Court to

---

[8] *See* Sara Daniel, *A Warranty Expired: Time to Rid Louisiana of Fitness for Ordinary Use*, 79 La. L. Rev. 281 (2018); George Bilbe, *Redhibition and Implied Warranties Under the 1993 Revision of the Louisiana Law of Sales*, 54 La. L. Rev. 125, 138-41 (1993).

make an *Erie* guess. The issue stems from the fact that redhibition and the warranty of fitness for ordinary use provide for two different remedies, but the two warranties seemingly overlap. Redhibition provides a remedy for buyers who buy defective goods that are useless or inconvenient. The warranty of fitness for ordinary use provides a different remedy for goods that are not fit for ordinary use. The logical anomaly is that defective goods under the definition of redhibition will always be unfit for their ordinary use, and goods unfit for their ordinary use will always be defective as defined by redhibition. Because the Court has decided to allow the LPLA claims to proceed against the SCOA Defendants, the difference in remedies between the warranties has less pronounced consequences. However, the remedy distinction is important for resolving the legal questions raised by the present motion.

### 1.  Background on the Interaction Between Redhibition and Fitness

The interaction between redhibition and the warranty of fitness has a tumultuous and well-documented history. Redhibition is a staple of the civil law and has existed since the Louisiana Civil Code of 1870.[9] The warranty of fitness is a product of the common law and made its way to the Civil Code in 1993.[10] A complete history of these articles' drafting was recently exposed and documented in

---

[9] Bilbe, *supra* note 1 at 126.
[10] Daniel, *supra* note 1 at 297.

Sara Daniel, *A Warranty Expired: Time to Rid Louisiana of Fitness for Ordinary Use*, 79 La. L. Rev. 281 (2018). This legislative history is important because the lack of a clear legislative intent suggests that the Court should not try to glean a meaning from these articles based on legislative history.

The revision on the law of sales and the code articles at issue was delegated to the Louisiana State Law Institute.[11] The reporter and principal drafter of the law was Professor Saul Litvinoff; however, the Law Institute Council had to vote for final approval of the revision to send to the legislature.[12] During the drafting, a Council member moved to have Professor Litvinoff consider adding the warranty of fitness to the Civil Code.[13] Professor Litvinoff discussed the issue with his committee and ultimately recommended that the warranty of fitness not be introduced as redhibition could cover the same scenarios and the warranty of fitness would "wreak veritable havoc in the law."[14] Anticipating that Council members would disagree, Professor Litvinoff drafted an article sourced from the U.C.C. for the warranty of fitness to discuss with the General Council. The original proposed article on fitness did not contain a reference to a different remedy scheme than what was already provided by redhibition.[15]

---

[11] *Id*. at 299.
[12] *Id*. at 300.
[13] *Id*.
[14] *Id.* at 300-301.
[15] *Id*. at 302.

When Professor Litvinoff returned to the Council, several members still insisted that the warranty of fitness be added. One member opined that there was a distinction between the two warranties.[16] Another member opined that the warranty of fitness could address things that are not necessarily defective.[17] Following these discussions, Professor Litvinoff added the paragraph designating remedies under conventional obligations to the warranty of fitness articles, the Council voted in favor, and the legislature passed present La. Civ. Code art. 2524: Thing fit for ordinary use.[18]

It is clear that an in-depth discussion about the ramifications of the existence of the two warranties, especially the differing remedies, never occurred. Indeed, commentary expressing the problem of the overlap between redhibition and warranty of fitness along with the differing remedies surfaced almost immediately after the revision was passed.[19] Commentators predicted that Courts would have difficulty applying the two warranties in real cases, and this prediction was mostly fulfilled.[20]

2.  The Options and the Anomalies

---

[16] *Id.*

[17] *Id.*

[18] *Id.* at 303.

[19] *See, e.g.*, Bilbe *supra* note 1.

[20] A discussion of the confusion in the courts along with specific examples can be found in Daniel, *supra* note 1 at 307-312.

Taking into account the text of the Code, the context of the two warranties, and a combination of both, three options emerge for dealing with the interaction between redhibition and fitness for ordinary use. No option is perfectly ideal since each one either violates a maxim of interpretation or does violence to another Code article.

### i. *Option 1: The historical approach*

Article 2524 comment (a) instructs, "This Article is new. It does not change the law, however. It gives express formulation to the seller's obligation of delivering to the buyer a thing that is reasonably fit for its ordinary use." If this article truly does not change the law, then the warranty of fitness for ordinary use should be interpreted in light of how it was framed before the revision. The primary guidance, therefore, comes from *Rey v. Cuccia*, 298 So. 2d 840 (La. 1974) and *Hob's Refrigeration & Air Conditioning, Inc. v. Poche*, 304 So. 2d 326 (La. 1974). This pair of Louisiana Supreme Court cases addresses the relationship between redhibition and fitness pre-revision.

In *Rey*, a buyer purchased a trailer, and eight days later, took a trip to Alabama. *Rey*, 298 So. 2d at 842. On the return trip, the trailer came loose from its frame. *Id*. The Court stated, "In Louisiana sales, the seller is bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for the product's intended use." *Id*. Thus, the Louisiana Supreme Court acknowledged some type of warranty

of fitness. The Court then proceeded to apply the traditional redhibition analysis and recognized no additional responsibilities of the seller. *Id.* at 843 – 47; *See also* Bilbe, *supra* note 1 at 139.

In *Hobs*, the Court quoted the same general rule from *Rey*: "In Louisiana sales, the seller is bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for the product's intended use." *Hobs*, 304 So. 2d at 327. The issue in *Hobs* involved the purchase of an air conditioning compressor that the buyer contended stopped working two weeks after purchase. *Id*. The seller argued that the unit functioned properly until three months after the sale. *Id.* at 328. After assuming that the seller's story was correct, the Court stated that the unit "did not comply with the implied warranty of fitness for the purpose for which purchased." *Id*. However, the Court assumed that the compressor "should reasonably be expected to last longer than three months." *Id*. Based on these assumptions made by the Court, the failure of the compressor had to be attributed to defects in the original design and, therefore, defective at the time of sale.[21] Thus, the Court's decision accords with the law of redhibition.

Based on this review of the Louisiana history of the warranty of fitness, it would appear that the legislature codified warranty of fitness in accord with how the Louisiana Supreme Court acknowledged the warranty. Indeed, revision comment (a)

---

[21] For a closer look at the logic *see* Bilbe, *supra* note 1 at 140.

to Article 2524 supports this interpretation. The conclusion under this option would be that the warranty of fitness is to be analyzed under the law of redhibition. Redhibition, therefore, subsumes the warranty of fitness for ordinary use. The problem, however, is this interpretation renders inoperable the remedy paragraph under Article 2524 which provides breach of contract remedies for warranty of fitness.

### ii. *Option 2: The textual approach*

Ignoring the confusing and muddled history of this law, the Court could look solely at the text of Article 2524. Under the text, there is indeed a change in the law contrary to the first revision comment. That change comes in the form of greater remedies (contractual damages and rescission) when a seller does not deliver a thing reasonably fit for its ordinary use. The anomaly of this reading is that if the thing sold has redhibitory defects, it, by definition, is unfit for its ordinary use.[22] This interpretation necessarily makes redhibition more lucrative for an aggrieved buyer than what the law of redhibition ordinarily supplies. However, a buyer who purchases from a seller in bad faith will likely elect for remedies under the law of redhibition since a bad faith seller in redhibition is liable for rescission, damages,

---

[22] Bilbe, *supra* note 1 at 140.

and attorney fees. Under this interpretation, the warranty of fitness essentially subsumes redhibition for remedy purposes except when a seller is in bad faith.[23]

### iii. Option 3: The forced distinction

Stone and the SCOA Defendants focus much of their argument on a line of non-controlling cases that have tried to force a distinction between redhibition and warranty of fitness for ordinary use. The cases rely on Article 2524 revision comment (b) which says, "Under this Article, when the thing sold is not fit for its ordinary use, even though it is free from redhibitory defects, the buyer may seek dissolution of the sale and damages, or just damages, under the general rules of conventional obligations." This interpretation seems somewhat consistent with what the small group of Law Institute Council members sought to achieve and is championed by the *Cunard* line of cases. However, this interpretation, apart from being inconsistent with revision comment (a), carries its own anomalies.

In *Cunard Line Co. v. Datrex, Inc.*, 926 So. 2d 109, (La. App. 3d Cir. 2006), the Louisiana Third Circuit Court of Appeal attempted to reconcile redhibition and warranty of fitness for ordinary use. In *Cunard*, an owner of cruise ships ordered lighting for exits and escapes. *Id*. at 111. Shortly after delivery and installation, the lights malfunctioned primarily by shorting out. *Id*. Importantly, the buyer argued that

---

[23] The Court notes again that the existence of a cause of action under the LPLA mutes these effects since the LPLA provides a remedy for tort damages caused by the defective product. As such, the contractual damages may theoretically share overlap with LPLA damages.

the lights were unfit for ordinary use in a cruise ship and that the buyer relied on the seller's skill in selecting the proper system compliant with proper regulations. Without much discussion, the Third Circuit relied on Article 2524 comment (b) and held that the distinction between redhibition and warranty of fitness is whether a defect exists. The Court concluded that the buyer could only pursue redhibition since the buyer alleged "defects" in the complaint.[24]

The *Cunard* decision and its reasoning informed the decisions in *Sw. Louisiana Hosp. Ass'n v. BASF Const. Chemicals, LLC*, 947 F. Supp. 2d 661, 699 (W.D. La. 2013), *amended* (Sept. 6, 2013); *Stroderd v. Yamaha Motor Corp., U.S.A.*, No. CIV.A. 04-3040, 2005 WL 2037419, at *3 (E.D. La. Aug. 4, 2005); *Chesapeake Louisiana, L.P. v. Innovative Wellsite Sys., Inc.*, No. CIV.A. 12-2963, 2014 WL 5796794, at *4 (W.D. La. Nov. 6, 2014) among others. All of these cases hold that there is a distinction between a thing that is defective (redhibition) and a thing that simply does not work (warranty of fitness). As discussed above in Option 2, this, logically, is a distinction without a difference. The federal cases cited seem to also hold that redhibition "subsumes" warranty of fitness when a defect exists.

Stone and the SCOA defendants focus primarily on the *Cunard* theory and rely on the federal cases cited above along with other similar cases. However, this

---

[24] This was dispositive of the case because of a prescription issue. In addition to the remedies, there is another difference between redhibition and warranty of fitness. Redhibition generally carries a prescriptive period of 1 year whereas warranty of fitness carries a prescriptive period of 10 years. By finding that only redhibition applied because the buyer alleged "defects," the buyer's claim was prescribed.

line of cases has been criticized[25] mostly for the reasons previously stated. Is it even possible to have a thing that is not defective yet unfit for ordinary use? *Cunard* is also troubling in that the buyer ordered a particular lighting system and relied on the seller's knowledge for a lighting system that would specifically work on ships. Thus, the buyer's claim in *Cunard* is better characterized as a claim for fitness for *particular* use as opposed to ordinary use for which the defect distinction makes more sense. In other words, a thing could be unfit for the specific purpose the buyer asked the seller to accommodate (i.e. ship lighting) while also not being defective in and of itself (i.e. lighting generally).

### iv. *Which interpretation?*

Given the troubled history behind these warranties, the Court endorses the textual approach in Option 2. The legislative history behind the law is unclear and contradictory at times so interpretations based on the history should be avoided. The Court must give meaning to the law as the legislature passed it, and this Court is convinced that the Louisiana Supreme Court would do the same. Although this solution is not perfect, no interpretation of this law is, and the legislature should address these troublesome warranties. The textual approach also accords with *Justiss Oil Co. v. T3 Energy Servs., Inc.*, No. 1:07-CV-01745, 2011 WL 539135, at *4 (W.D. La. Feb. 7, 2011).

---

[25] Daniel, *supra* note 1 at 309-312.

In *Justiss Oil*, Judge Drell found *Cunard* inapplicable and unpersuasive. After correctly concluding that there was no guidance from the Louisiana Supreme Court on this issue, the court allowed claims under redhibition and warranty of fitness to proceed together. The *Justiss* court seemed to arrive at its conclusion based on the text of the Code and the fact that all elements could be proven. *Id.* at *5.

### 3. Article 2529: Warranty of Quality or Kind

Article 2529 has received very little commentary or judicial attention. Nevertheless, this article's application is clearer than Article 2524. Article 2529 provides that breach of contract rules apply when the seller delivers a thing without defects but that is not of the kind or quality specified in the contract. This article mainly applies to breaches of express warranties or terms in the contract. *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*, No. CIV.A 09-0750, 2010 WL 892869, at *8 (W.D. La. Mar. 11, 2010); Bilbe, *supra* note 1 at 143. It merely serves to clarify that delivery of the wrong thing or damage in transit is not redhibition but rather breach of contract. *Id. See also* La. Civ. Code art. 2529 revision comments.

The parties in this case spend very little time discussing the facts that would pertain to this article. Stone's petition alleges that the tubing and couplings were not what was contracted for because they were not up to certain specifications. At this juncture, the Court cannot adequately ascertain what specifications were explicitly contracted for since the issue is insufficiently briefed and the record lacks clarity. If

certain specifications were warranted and not performed, then Stone may have an action under Article 2529. As such, genuine issues of material fact exist that preclude summary judgment. Redhibition certainly does not subsume Article 2529 as a matter of law. Redhibition precludes Article 2529 when the thing is defective overall outside of express terms and warranties.

### Conclusion

Based on the above analysis, Defendants' Motion for Partial Summary Judgment, Rec. Doc. [169], is **DENIED**. Pyramid meets the alter ego definition of a seller-manufacturer under the LPLA, and at the very least, issues of fact exist as to causation and "bucking on." Furthermore, redhibition does not subsume the other sales warranties, and Plaintiff is entitled to pursue all its Civil Code warranties.

**THUS DONE AND SIGNED** in Lafayette, Louisiana, on this 28th day of July, 2020.

MICHAEL J. JUNEAU
UNITED STATES DISTRICT JUDGE